### W. P. NEWTON v. THE STATE.

No. 2125. Decided March 21, 1900.

**1. Murder—Irrelevant Testimony.**

On a trial for murder, evidence to the effect that some months before the killing one G. H., who was charged by a separate indictment with the same murder, told a witness for the State, defendant not being present, that defendant had agreed to pay him $50 to testify as a witness for his (defendant's) son in a case pending against the son for cattle-theft, was wholly irrelevant and inadmissible to prove any issue in the case on trial.

**2. Evidence of Overtures to Purchase Witnesses.**

Overtures to purchase witnesses and matters of that sort made by others than defendant and without his knowledge and consent, can not be used as evidence against defendant on his trial.

APPEAL from the Criminal District Court of Dallas. Tried below before Hon. CHARLES F. CLINT.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The indictment charged appellant with the murder of Jim Peel, on the 20th day of January, 1898, by shooting him with a pistol.

The following statement of the case, which is substantially correct, is taken from the brief of counsel for appellant.

The theory of the prosecution is that the defendant and one George Hammil, acting upon an agreement to kill Jim Peel, went on the 20th of January, 1898, to the place where he was working in some new ground, and there, in pursuance of a common purpose and design, killed him; and to support this theory, it is contended that the defendant and Hammil rode from Forney that day together, and appeared at the scene of the homicide practically together; and further that the defendant, Newton, having a son who was at that time under indictment in Kaufman County, Texas, for cattle-theft, was at enmity with Peel, the deceased, for some talk he had been making about Newton; and for a basis for Peel's conduct, under the theory of the prosecution, it was admitted in evidence that George Hammil, some three months before the homicide, had told one Bob Hayes that defendant was to pay him, Hammil, $50 to testify as a witness in behalf of appellant's son Robert on the said cattle-theft charge, and to connect this, it was shown in evidence by Bob Hayes that about a week before the homicide, he told Peel, the deceased, what Hammil had told him.

It was shown by the State that Hammil reached the scene of the homicide in advance of Newton, and took Peel off for a talk, and around a brush pile from the position the witness Clark occupied, and which was some twenty feet in diameter and as many feet in height, and that while around the brush pile two shots were fired, which were shown to have been fired by Peel, the deceased, and a pistol was picked up near which belonged to and was dropped by Hammil; and immediately succeeding the shooting, that Newton, in furtherance of his agreement, galloped up and killed Peel, and that after the death of Peel he was heard to curse him and say that he had him where he wanted him, that he had been running around talking cow-stealing, etc.

The theory of the defense is, and which is supported by the evidence, that defendant went to Forney that morning on business, and while leaving Forney for home Hammil met him and asked him to wait on him a minute and ride out together, and that their getting together was purely accidental, the man Hammil being a tenant of appellant and lived on one of appellant's places, between appellant's residence and appellant's new ground, which was in proximity to the new

ground deceased was clearing. That while en route home appellant separated from Hammil, delivered a package of salt to a neighbor, and received a message delivered to him as coming from one of his negro employes at the new ground, for him to come there and check up the wood, as they would likely be through with the job that evening, and that appellant rode on from his house to the new ground. The man Hammil was en route to his home, and before he alighted from his horse, he was told by a witness that Peel, the deceased, had been at his house in his absence, and left a message for him to come where he was as soon as he returned home, and that Hammil, upon receiving the message, went on to where Peel was at work, which carried him part of the way the same route that the defendant had gone in traveling to his new ground; that Hammil arriving at the scene of the homicide, called to Peel to see him, and Peel had him come where he and a man named Clark were at work on a tree, which had been felled near the brush pile; that Hammil, arriving at the place where deceased was, deceased told him that he had heard some threats, and suggested that they walk off and talk it over together. At this juncture, it is contended by appellant that he had just ridden up, having been to his new ground where the hands had about completed their work, and was collecting his tools, and was told by them that the deceased had borrowed some iron wedges for splitting cordwood, and that he went to the deceased and was there for that purpose when the two men walked off together in a westerly direction from where he was sitting on his horse; and further, that he observed Peel drawing his pistol to shoot Hammil, who was in advance of him, and as Hammil turned, as if expecting deceased to follow him, observed the pistol being drawn, threw up his right arm when the pistol fired, at the drawing of which defendant hallooed at deceased to know what he meant, and immediately upon the firing of the two shots at Hammil the deceased wheeled and shot at defendant, who went for his saddle pockets, got out his pistol, and his first shot at Peel went with the second shot of Peel at him, and the firing continued until they both emptied their pistols. It was in evidence by both the State and defendant that Bob Hayes had never told the defendant what Hammil had told him, and that the defendant had never heard of Hammil having cursed and threatened Peel before Christmas prior to the homicide, and there was an entire absence of evidence that Peel had ever said anything pro or con about the defendant on any subject, but on the contrary, the State's witness W. K. Clark testified that on the day preceding the homicide defendant was up at their new ground, and had spent about an hour laughing and talking in friendly chat with Peel, the deceased. The defendant, in the shooting, was twice wounded, once the ball entering under the left nipple and lodged against the fifth rib, beyond which was the apex of the heart; second, he was wounded below the left wrist; and third, his bridle rein was cut in two by a shot; and defendant's theory is that that same ball was thus checked in its impetus and struck him under

the left nipple. The man Hammil had two distinct wounds in his right arm, one of them going through the arm and the other entering the right arm below the shoulder and passed out behind the right sholder. The defendant denied having used any language or epithets of any kind addressed to the deceased, or about the deceased, after the shooting, as contended by the State, and denied having any ill feeling of any nature.

*Stillwell H. Russell* and *W. S. Lemon,* for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of five years.

By the witness Hayes, the State was permitted to prove that in the fall of 1897, before this killing, which occurred in January, 1898, George Hammil told witness Hayes that defendant had agreed to pay him (Hammil) $50 to testify as a witness in behalf of Newton's son in a case then pending in Kaufman County, wherein said Newton's son Bob was charged with cattle-theft. The bill further recites the evidence shows that neither Newton nor Hammil, at the time said statement was made, knew deceased, Peel. It was further shown that Hayes never told Peel of this conversation until about a week before the killing of Peel, and Hayes testified that he never told any person of this conversation except Peel; and it was further shown that the testimony disclosed that neither Newton nor Hammil knew or had ever been apprised of the fact that Hayes had told Peel of the statement referred to; and it is further shown that Newton was not present when this statement was made by Hammil to Hayes. It was then objected that this testimony was irrelevant and inadmissible to prove any issue in the case, (1) because defendant was not present when the conversation between Hammil and Hayes occurred; (2) that the evidence was not competent to prove a conspiracy, because a conspiracy can not be proved by the acts and declarations of a coconspirator, but must be proved aliunde; (3) this was a statement of a past occurrence, and not made in furtherance of the common design; (4) it was injurious to appellant, in that it presented him to the jury as a man guilty of bribery. It is well settled, by a long line of decisions in this State, that overtures to purchase witnesses, and matters of that sort, made by others than defendant, without his knowledge and consent, can not be used against him upon his trial. See Barbee v. State, 23 Texas Crim. App., 199; Maines v. State, 23 Texas Crim. App., 568; Rushing v. State, 25 Texas Crim. App., 607; Nalley v. State, 28 Texas Crim. App., 387; Favors v. State, 20 Texas Crim. App., 155. Nor, as made by the bill of exceptions, could this testimony be admitted against appellant as showing a conspiracy. Dungan v. State, 39 Texas Crim. Rep., 115; Rhodes v.

State, 39 Texas Crim. Rep., 332. The testimony was clearly inadmissible.

The other matters complained of will hardly arise upon another trial. For the error pointed out, the judgment is reversed, and the cause remanded.

*Reversed and remanded.*

Brooks, Judge, absent.